LAW OFFICE OF DONALD F. BURKE
45 GALE ROAD
BRICK, N.J. 08723
TEL: (732) 966-4922
ATTORNEYS FOR PLAINTIFF
C.G.B.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| C.G.B., | |
| Plaintiff, | CIVIL ACTION NO.: |
| v. | |
| AIDA SANTA LUCIA, VAROUJAN KHOROZIAN, KYLE KHOROZIAN, DEREK KHOROZIAN and JOHN DOES 1-5 (being agents, servants and employees of defendants as a continuing investigation may reveal who are fictitiously named because their true identities are unknown), | COMPLAINT AND DEMAND FOR JURY TRIAL |
| Defendants. | |

C.G.B., by and through her undersigned counsel, alleges as follows:

## INTRODUCTION

1.     Defendants Aida Santa Lucia, Varoujan Khorozian, Kyle Khorozian and Derek Khorozian (individually and collectively "Defendants") trafficked C.G.B. from her native Cameroon to the United States for involuntary servitude and forced labor as a domestic servant in their home. Defendants subjected C.G.B. to inhumane working and living conditions.

2.     Defendant Santa Lucia secured a B-1 visa for C.G.B. into the United States which is issued to those seeking entry for business purposes.

3.     Upon information and belief, defendant Santa Lucia previously brought citizens from Cameroon and other countries into the United States on B-1 Visas as a means to facilitate human trafficking.

4.     Upon information and belief, defendant Santa Lucia has previously used these victims of human trafficking in her home as domestic servants subject to the same living and working conditions as C.G.B.

5.     C.G.B., who was 49 years-old when she was brought to the United States, is a former nun of the religious order Franciscan Missionary Sisters of the Sacred Heart.

6.     At the time defendant Santa Lucia recruited C.G.B. to the United States in order to perform work as Ms. Santa Lucia's domestic helper, C.G.B. was a teacher in Cameroon.

7.     C.G.B. was a primary provider for her elderly mother in Cameroon and helped support her entire family including her nieces and nephews.

8.     Her mother requires ongoing medical care and medication. C.G.B.'s income was used to help cover her family's expenses, including medical expenses.

9.     As the financial burden of supporting her mother mounted, C.G.B. received a life changing opportunity.

10.    Defendant Santa Lucia contacted C.G.B. about a lucrative offer to work in the United States as a translator.

11.     The position was to include pay at the going rate and more importantly, defendant Santa Lucia promised to obtain permanent residency status for C.G.B. in the United States.

12.     C.G.B. readily accepted the offer because she viewed it as a great opportunity for her and it would provide a better future for C.G.B. and her family.

13.     As set forth in more detail below, defendants required C.G.B. to work as a domestic servant in their 7 bedroom, 11 bathroom house in Alpine, New Jersey.

14.     Defendants forced C.G.B. to work from 9:00 a.m. to at least 9:00 p.m. or later and to be available around the clock.

15.     C.G.B. rarely had a single day off.

16.     Defendants paid C.G.B. approximately 50 cents per hour, leaving her little money with which to provide for the needs of her family she left in Cameroon and for her elderly mother's medical needs.

17.     Defendants used a variety of means to compel C.G.B.'s labor including threatening C.G.B. that if she left them she would be hunted down, jailed, and deported.

18.     C.G.B. rarely had the opportunity to leave defendants' home for personal reasons and fell into deep cultural and linguistic isolation.

19.     Even if she had left defendants' home, in Alpine, New Jersey there is little to no access to public transportation or other means of transportation.

20.     The conditions became intolerable for C.G.B. after defendants repeatedly yelled and screamed at C.G.B. claiming C.G.B. was not cleaning the house in an acceptable manner.

21.     C.G.B. felt belittled, inferior and abused.

22.     Defendant Santa Lucia never secured permanent residency status for C.G.B. as she had promised.

23.     When C.G.B. could take it no more, and decided to leave, she was told by defendant Santa Lucia that if she left defendant Santa Lucia would call immigration and have C.G.B. deported.

24.     C.G.B. told defendant Santa Lucia she would call the police.

25.     This caused defendant Varoujan Khorozian to cut off her access to her cell phone and transported C.G.B. to Newark, New Jersey where she was abandoned at the Bus Station.

26.     Since C.G.B. fled defendants' home, she has lived in fear that defendants would find her and make good on their threats to have her deported.

27.     This fear has taken an emotional toll on C.G.B., who, even after she fled, has lived in the shadows of society.

28.     C.G.B. has been unable to travel freely as a result of her fear and her uncertain immigration status.

29.     C.G.B. now seeks justice and damages for the trafficking and other injuries she suffered at the hands of defendants and which have continued to compound with the passage of time.

## BACKGROUND

30.     C.G.B. is a survivor of forced labor, involuntary servitude, and human trafficking, as defined by the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), Pub. L. No. 106-386, 114 Stat. 1464.

31.     C.G.B. is also a survivor of forced labor, involuntary servitude, and human trafficking, as defined by the New Jersey Human Trafficking Prevention, Protection and Treatment Act ("HTPPTA"), A. 3352/S. 2239.

32.     Traffickers coerce their victims into performing labor through a variety of means, including through psychological abuse, threats, isolation, and confinement.

33.     According to the United States State Department's 2014 Trafficking in Persons Report, available at http://www.state.gov/j/tip/ris/tiprpt/2013/index.htm, Cameroon is a source country for men, women, and children subjected to forced labor.

34.     As far back as 2001, Human Rights Watch reported on the special vulnerabilities of domestic workers who come to the United States on special visas for domestic employees, finding that compared to undocumented workers, "ironically, their special visas exacerbate their vulnerability to abuse."

35.     The report found that many migrant domestic workers are hesitant to leave their employers or file complaints to enforce their rights, often due to their "cultural and social isolation—lack of knowledge of U.S. law, few local contacts and friends, and inability to communicate in English."

36.     The report concluded that "the special visa programs for domestic workers are conducive to and facilitate the violation of the workers' human rights" and, unfortunately, if a migrant worker does not assert her own rights, it is unlikely that they will otherwise be protected. Human Rights Watch, Hidden in the Home: Abuse of Domestic Workers with Special Visas in the United States (2001), available at http://www.hrw.org/reports/2001/usadom/usadomO501.pdf.

## JURISDICTION AND VENUE

37.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because certain actions action arise under United States law. Supplemental subject matter jurisdiction exists for C.G.B.'s state-law claims pursuant to 28 U.S.C. § 1367.

38.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because defendants reside in this District.

## THE PARTIES

39.     C.G.B. is a citizen of Cameroon. Out of a concern for her personal safety and that of her family, she is described herein as C.G.B.

40.     At the time of certain of the events that give rise to this Complaint, C.G.B. resided in defendant Santa Lucia's home in Alpine, New Jersey.

41.     Upon information and belief, defendant Santa Lucia is a permanent resident and citizen of the United States and has business and government contacts and relationships in Cameroon.

42.     Ms. Santa Lucia is the wife of defendant Varoujan Khorozian and mother of defendants Kyle Khorozian, Derek Khorozian and Anthony Khorozian.

43.     Upon information and belief, defendants continue to reside in Alpine, New Jersey.

## ALLEGATIONS OF FACT

### A. Defendants Traffick C.G.B. to the United States from Cameroon

44.     C.G.B. was born in Cameroon and, prior to being brought to the United States by defendants, resided there.

45.     C.G.B. speaks French, Italian and her native language Eton.

46.     C.G.B. became a Catholic nun in 1990 serving the Franciscan Missionary Sisters of the Sacred Heart.

47.     In 2010, she left the order to teach high school religion in Yaoundé, Cameroon.

48.     C.G.B. learned from a friend named A. E. about the possibility of working in the United States for defendant Santa Lucia.

49.     A. E.  introduced defendant Santa Lucia to C.G.B.

50.     Defendant Santa Lucia would travel to Cameroon for business.

51.     Defendant Santa Lucia is an American citizen originally from Italy, who, like C.B.G., speaks Italian.

52.     In July 2013 defendant Santa Lucia came to Cameroon and C.G.B. met her in A.E.'s house.

53.     Defendant Santa Lucia asked C.G.B whether she had a husband or children.

54.     Defendant Santa Lucia asked C.G.B. to come to the U.S. to work for her as a translator.

55.     Importantly, defendant Santa Lucia promised C.G.B. that she would work with the United States and Cameroon governments to obtain permanent legal status for C.G.B. in the United States. Defendant Santa Lucia assured C.G.B. that this would not be a problem because she had connections in the embassy in Cameroon.

56.     In August 2013, defendant Santa Lucia accompanied C.G.B. to the American Embassy where she assisted C.G.B. in obtaining a B-1 Visa.

57.     Defendant Santa Lucia arranged for an initial interview with the United States embassy in Cameroon.

58.     Over the next several weeks, defendant Santa Lucia took steps to secure C.G.B.'s passport and B-1 Visa.

59.     Defendant Santa Lucia provided C.G.B. with a letter stating that C.G.B. would be working on behalf of Leverage Plus, LLC of Fort Lee, New Jersey as an interpreter and technical advisor in the United States and needed a "5 year multi-entry business visa."

60.    Defendant Santa Lucia told C.G.B. to bring the letter to the U.S. embassy in Cameroon and use it to obtain a B-1 Visa.

61.    After the B-1 Visa was issued, defendant Santa Lucia arranged for C.G.B.'s travel to the United States.

62.    Defendant Santa Lucia paid for the visa, flight, and all travel expenses and promised she would take care of everything – including food, clothes, and healthcare.

63.    C.G.B. accepted the opportunity because she believed the wages and the promised working conditions were better than what she could obtain in the Cameroon and she wanted to obtain permanent legal status, which was promised by defendant Santa Lucia.

**B.    C.G.B. Arrives in the United States**

64.    C.G.B. arrived in the United States on November 24, 2013.

65.    C.G.B. was met by defendants Santa Lucia and Varoujan Khorozian.

66.    They transported C.G.B. to their shared residence in Alpine, New Jersey where she met the family.

67.    Upon arrival at the house shared by Santa Lucia and Varoujan Khorozian, defendant Santa Lucia told C.G.B. she would be working as a domestic servant and would be responsible for cleaning the house, making the beds, doing the laundry, gardening, attending to the family's three dogs, and other responsibilities related to the household.

68.     C.G.B. felt she had little choice but to abide by defendants' directions and she attended daily to her chores with the expectation she would obtain legal residency if she worked as directed.

## C. Defendants Force C.G.B. to Work Excessive Hours as a Domestic Servant and Pay Her Meager Wages

69.     Rather than working 7-8 hours per day as promised, C.G.B. typically worked 12 hours per day or more and was expected to remain on-call during the night.

70.     C.G.B. typically began her day by 9:00 a.m. and worked until at least 9:00 p.m., and occasionally much later.

71.     C.G.B. maintained this schedule seven days per week with some time off on Sunday to attend weekly Mass at a Catholic Church in Tenafly, New Jersey.

72.     Defendants demanded that C.G.B. engage in labor well beyond the scope of anything discussed prior to her coming to the United States.

73.     Defendants required C.G.B. to spend the daylight hours tending to their sizable property—including taking care of their animals, watering the plants, and cleaning the patio and outdoor furniture.

74.     Defendants gave C.G.B. a pittance for her hours of labor. Defendants paid C.G.B. $200 per month—or approximately $6 per day.

75.     Based on a 12-hour work day—a duration that C.G.B. commonly exceeded— this pay amounts to 50 cents per hour.

76.     This was less than the amount of money C.G.B. made in Cameroon as a High School Religion teacher.

77.     C.G.B. was unaware that defendants paid her a small fraction of the minimum wage required under federal and state law because defendants did not provide her with, or display in the residence, any information about these requirements.

**D. C.G.B.'s Living Conditions and Medical Care**

78.     Defendants also failed to abide by their promise to provide C.G.B. with access to basic medical and dental care.

79.     C.G.B. had a toothache which went unattended while she was with defendants despite defendant Santa Lucia's promise to provide health care. These unattended conditions caused C.G.B. much pain.

80.     Defendants' unwillingness to provide C.G.B. with regular healthcare resulted in painful, long-term medical issues.

81.     Defendants rarely allowed C.G.B. to indulge in a moment of personal time. For example, Ms. Santa Lucia did not allow C.G.B. to have regular access to a television or radio, or time to enjoy listening to music.

82.     C.G.B. was allowed to use the computer only once per week. The computer was password protected and defendants did not provide C.G.B. the password.

83.     Defendants never sought to accommodate C.G.B.'s preferences for food or personal items; she was expected to eat whatever food or use whatever personal hygiene products were made available.

11

84. C.G.B. brought few items of clothing with her from Cameroon because defendant Santa Lucia promised to furnish her with what she needed.

## E. Defendants' Promise to Obtain Permanent Legal Status for C.G.B. Turns Out to be a Lie

85. Doubts arose about defendant Santa Lucia's representations that she would handle the necessary immigration-related paperwork to obtain permanent status for C.G.B.

86. When C.G.B. asked her about her immigration paperwork, defendant Santa Lucia yelled at C.G.B. and made excuses about why it could not be obtained.

87. Defendant Santa Lucia claimed a series of ever-changing obstacles prevented her from obtaining permanent status for C.G.B.

88. Defendant Santa Lucia also claimed that money C.G.B. was earning, in excess of the $200 per month she was paying C.G.B., was being set aside to pay for an immigration attorney and other expenses related to obtaining permanent legal status for C.G.B..

89. Defendant Santa Lucia exploited C.G.B.'s lack of knowledge about immigration procedures in the United States to put her in fear of the consequences if she attempted to leave their home.

90. Defendant Santa Lucia told C.G.B. that she would be jailed and deported by the police and immigration officials if she attempted to leave them and C.G.B. interpreted these threats to mean that defendants would report her to the authorities if she ceased to provide them with her labor, but they would otherwise allow her to remain "safe."

91.     Defendants' strategic use of immigration procedures facilitated their psychological coercion of C.G.B.

92.     Defendants created an environment of fear and uncertainty that trapped C.G.B. and allowed them to continuing receiving her forced labor.

93.     Defendants knew that C.G.B. would continue to endure these working conditions to obtain the money she needed to provide for her family and ailing mother in Cameroon.

## F. Defendants Isolate C.G.B. in their Alpine, New Jersey Home

94.     Defendants isolated C.G.B. from her family, friends, culture, and local community.

95.     Defendant Santa Lucia believed C.G.B. was too close to defendant Santa Lucia's mother, who showed C.G.B. kindness.

96.     C.G.B. was not invited to eat with the family.

97.     C.G.B. served the family dinner and ate on her own and then cleaned up after the family was finished eating.

98.     C.G.B. was able to call home only about once per month using the home phone.

99.     When calling home, C.G.B. would have to advise defendants who she was calling and, thereafter, what she was talking about on the phone call.

100.     Eventually, defendants provided C.G.B. a cell phone so they could maintain a direct line of communication with her when they were outside the home.

101.   C.G.B. missed numerous opportunities to console and celebrate with her family because of defendants' actions.

102.   Further, throughout her nearly 9 month ordeal, C.G.B. almost never left the home unaccompanied.

103.   C.G.B. did not drive a vehicle, nor did she have access to one.

104.   Without transportation assistance from defendants, C.G.B. was effectively trapped in their home.

105.   C.G.B.'s isolation further deprived her of access to her religion, culture and language except on Sundays when she would be driven to and from the Catholic Church in Tenafly, New Jersey.

106.   C.G.B. did not have regular access to literature, television programming, or radio in her native language and she was unable to keep apprised of the current events in her home country.

## G. C.G.B. is Abandoned by Defendants in Newark, New Jersey

107.   On August 12, 2014 at about 7:30 in the evening, C.G.B. had an incident with defendant Derek Khorozian.

108.   C.G.B. was told to clean a room for Derek's girlfriend who was coming to stay with the family.

109.   Derek did not believe C.G.B. had cleaned the room well enough.

14

110. Defendant Derek became agitated and enraged and screamed at C.G.B. for doing a poor job cleaning the room.

111. C.G.B. was crying and went to her room to collect her thoughts and contacted friends in Pennsylvania who she knew in Cameroon.

112. C.G.B.'s friends were concerned about C.G.B.'s well being and contacted police who came to defendants' home and defendant Santa Lucia met the police at the gate and conversed with them.

113. Defendant Santa Lucia advised defendant Varoujan Khorozian that C.G.B. had contacted the police and defendant Varoujan Khorozian had C.G.B.'s cell phone disconnected.

114. The police eventually proceeded to the entrance of the home and asked C.G.B., in the presence of the defendants, if everything was OK.

115. Feeling intimidated, scared and nervous about what would happen to her, C.G.B. simply said "yes" and the police left.

116. C.G.B. was terrified of leaving defendants' home because of the things defendant Santa Lucia had told her about the police and her immigration status and because she did not know anyone in New Jersey; however, the fear of staying with defendants under these conditions was greater.

117. On or about August 13, 2014 at 9:00 p.m., defendant Varoujan Khorozian transported C.G.B. by car to Newark, New Jersey where he confiscated her now useless cell phone and left her at the bus depot.

15

118.   On the way to the bus depot, defendant Varoujan Khorozian told C.G.B. she should not have contacted the police.

119.   When they arrived at the bus depot, defendant Varoujan Khorozian put C.G.B.'s bags in the street.

120.   Since fleeing defendants' home, C.G.B. has sought refuge with friends who are also natives of Cameroon.

121.   As C.G.B. is not a legal resident, she is afraid of being arrested and/or deported.

122.   C.G.B. is also afraid of returning to Cameroon, as defendant Santa Lucia has led C.G.B. to believe she will no longer be safe in her home country.

**H. Prolonged Emotional and Psychological Harm Suffered by C.G.B.**

123.   C.G.B. has suffered from emotional distress and anxiety as a result of her human trafficking experience.

124.   Among the most profound impacts for C.G.B. has been missing her family members and friends in Cameroon.

125.   Since escaping, C.G.B. has also had difficulty sleeping due to the stress caused by defendants' threats that the police would find and arrest her.

126.   She also constantly doubts her own self-worth as a result of defendants' scheme to degrade her and keep her under their control.

127.   C.G.B. continues to experience emotional and psychological pain because of defendants' offenses.

128.    After C.G.B. fled, defendant Santa Lucia sent C.G.B. an email claiming C.G.B. engaged in illegal conduct by coming to the United States on "false claims" and insinuated she will coordinate with the U.S. and Cameroon governments to see what can be done about it.

129.    The email also included C.G.B.'s passport number.

130.    Defendant Santa Lucia also sent C.G.B a bill for "expenses" totaling $19,448.

131.    This continued intimidation, harassment and abuse has increased C.G.B.'s fear, anxiety and stress.

## CLAIMS FOR RELIEF

### COUNT I
### (Forced Labor in Violation of the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), 18 U.S.C. §§ 1589, 1595)
### (Against All Defendants)

132.    C.G.B. re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

133.    18 U.S.C. § 1589 makes it unlawful to "knowingly provide[ ] or obtain[ ] the labor or services of a person . . . (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform

such labor or services, that person or another person would suffer serious harm or physical restraint."

134.    As alleged herein, defendants knowingly provided or obtained C.G.B.'s labor in violation of the forced labor provisions of 18 U.S.C. § 1589 through (i) threats of serious harm, including psychological, financial, or reputational harm, against C.G.B.; (ii) threats of physical restraint to C.G.B. through threats of forced deportation, and other affirmative acts; (iii) a scheme, plan, or pattern intended to cause C.G.B. to believe that if she did not perform labor for defendants, she or her family would suffer serious harm or physical restraint; and (iv) abuse or threatened abuse of law or legal process by repeatedly telling C.G.B. that she would be jailed and deported if she ceased to provide her labor to defendants.

135.    C.G.B. brings this claim for relief pursuant to 18 U.S.C. § 1595, which provides that "[a]n individual who is a victim of a violation of this chapter [18 USCS §§ 1581 et seq.] may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter [18 USCS §§ 1581 et seq.]) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees."

136.    As a direct and proximate result of defendants' actions, C.G.B. has suffered damages in an amount to be established at trial.

137.   C.G.B. is entitled to recover damages to account for the full value of her losses, including, but not limited to, emotional distress, lost wages, punitive damages, and other losses suffered by C.G.B. as a proximate result of defendants' conduct, along with reasonable attorneys' fees and costs incurred in this action.

## COUNT II
### (Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of the TVPA, 18 U.S.C. §§ 1590, 1595) (Against All Defendants)

138.   C.G.B. re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

139.   18 U.S.C. § 1590 makes it unlawful to "recruit[ ], harbor[ ], transport[ ], provide[ ], or obtain[ ] by any means, any person for labor or services in violation of [the sections included in Title 18, Part I, Chapter 77]."

140.   As alleged herein, defendants knowingly harbored, transported, provided for, and obtained C.G.B. for labor in violation, or attempted violation, of numerous provisions of Chapter 77, including 18 U.S.C. §§ 1584, 1589, and 1592(a). Further, defendant Santa Lucia recruited C.G.B. to obtain her labor in violation, or attempted violation, of numerous provisions of Chapter 77, including 18 U.S.C. §§ 1584, 1589, and 1592(a).

141.   C.G.B. brings this claim for relief pursuant to 18 U.S.C. § 1595.

142.   As a direct and proximate result of defendants' actions, C.G.B. has suffered damages in an amount to be established at trial.

143.    C.G.B. is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by C.G.B. as a proximate result of defendants' conduct, along with reasonable attorneys' fees and costs incurred in this action.

## COUNT III
### New Jersey Human Trafficking Prevention, Protection, and Treatment Act,
### N.J.S. § 2C:13-8.1
### (Against All Defendants)

144.    C.G.B. re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

145.    C.G.B. brings this claim for relief pursuant to N.J.S. § 2C:13-8.1.

146.    As a direct and proximate result of defendants' actions, C.G.B. has suffered damages in an amount to be established at trial.

147.    C.G.B. is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by C.G.B. as a proximate result of defendants' conduct, along with reasonable attorneys' fees and costs incurred in this action.

148.    C.G.B. is entitled to recover damages for pain and suffering, recovery of reasonable costs for necessary medical, dental, and psychological services and punitive damages.

149.    In addition, C.G.B. is entitled to an award of damages in an amount that is the greater of:

(1) the gross income or value to the defendant of the injured party's labor or services; or

20

(2) the value of the injured party's labor or services as determined by the "New Jersey Prevailing Wage Act," P.L.1963, c.150 (C.34:11-56.25 et seq.), the "New Jersey State Wage and Hour Law," P.L.1966, c.113 (C.34:11-56a et seq.), the Seasonal Farm Labor Act, P.L.1945, c.71 (C.34:9A-1 et seq.), the laws concerning the regulation of child labor in chapter 2 of Title 34 of the Revised Statutes, or any other applicable State law, and the "Fair Labor Standards Act of 1938," 29 U.S.C. § 201 et seq., or any other applicable federal law.

150.    In addition to any damages, penalty, injunction, or other appropriate relief awarded in an action brought pursuant to N.J.S. § 2C:13-8.1, the court may award to the injured person bringing suit reasonable attorneys' fees and costs.

## COUNT IV
**(Failure to Pay Federal Minimum Wage in Violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 216)**
**(Against All Defendants)**

151.    C.G.B. re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

152.    29 U.S.C. § 206 establishes the right of all persons who are employed to be paid a minimum wage for all hours worked, including employees in domestic service.

153.    At all relevant times, Ms. Santa Lucia and the other defendants acted jointly as C.G.B.'s employer and C.G.B. was their employee, performing labor and services as a domestic worker, within the meaning of 29 U.S.C. §§ 203(d)-(e) & 2060.

154.    Defendants failed to pay C.G.B. statutory minimum wages and overtime wages in violation of 29 U.S.C. § 206(a) and regulations of the United States Department of Labor.

155.    Defendants' failure to pay C.G.B. the required wage was willful. Defendants acted knowingly, willfully, or with reckless disregard that their conduct was prohibited as

evidenced by Ms. Santa Lucia submitting a fraudulent contract to obtain a visa for C.G.B. to enter the United States.

156.   29 C.F.R. § 516.4 requires employees subject to the federal minimum wage laws to post notices concerning minimum wage.

157.   At no time did defendants post the requisite notice.

158.   C.G.B. brings this claim for relief pursuance to 29 U.S.C. § 216(b).

159.   Defendants' willful violation of the FLSA entitles C.G.B. to recovery of her unpaid minimum wages and overtime wages since her arrival in the United States, an equal amount as liquidated damages, and reasonable attorneys' fees and costs of the action pursuant to 29 U.S.C. §§ 201 et seq. and United States Department of Labor regulations, in addition to declaratory relief.

**COUNT V**
**(Failure to Pay Minimum Wage in Violation of the New Jersey Wage and Hour Law N.J.S.A. 34:11-56a et seq.**
**(Against All Defendants)**

160.   C.G.B. re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

161.   C.G.B. was paid less than the minimum fair wage and overtime wages to which she was entitled under the provisions of N.J.S. § 34:11-56a et seq.

162.   Therefore, C.G.B. seeks to recover in this civil action the full amount of such minimum wage and overtime wages less any amount actually paid to her by defendants

together with costs and such reasonable attorneys' fees and costs as may be allowed by the court.

## COUNT VI
### (Fraudulent Misrepresentation)
### (Against Defendant Santa Lucia)

163.   C.G.B. re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

164.   Defendant Santa Lucia made false representations of material facts, intentionally and knowingly, to mislead C.G.B., who relied on the false representations, and consequently, suffered damages.

165.   Prior to C.G.B. coming to the United States, defendant Santa Lucia made false representations of material facts to C.G.B., including, but not limited to, statements about her working conditions in the United States and her promise to obtain permanent resident status for C.G.B.

166.   Defendant Santa Lucia also made repeated false representations about C.G.B.'s opportunities for return travel to Cameroon to visit her ailing mother and other family members.

167.   At the time that defendant Santa Lucia made these statements, she knew them to be false. Defendant Santa Lucia never had any intention of carrying out the representations.

168.   Defendant Santa Lucia intentionally and knowingly made these statements for the purpose of misleading C.G.B. to believe that her working conditions in the United States

23

would be better than in Cameroon and to obtain a B-1 visa to traffic C.G.B. into the United States and force her to work in defendants' Alpine, New Jersey mansion.

169.   C.G.B. reasonably and justifiably relied on defendant Santa Lucia's representations and believed that she could earn more money to assist her mother and family while having the freedom to return home to see her family periodically.

170.   As a direct and proximate result, C.G.B. suffered damages during her forced labor as a domestic servant for defendants, including the receipt of unlawfully low wages, the denial of her freedom and fundamental human rights, psychological abuse, and other economic and emotional harm.

171.   Defendants committed these acts maliciously and oppressively, with the wrongful intention of causing harm to C.G.B. and in conscious disregard for her well-being.

172.   C.G.B. is entitled to recover damages in an amount to be determined at trial, including compensatory and punitive damages, attorneys' fees, and the costs of this action.

## COUNT VII
### (False Imprisonment)
### (Against All Defendants)

173.   C.G.B. re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

174.   Defendants intentionally restricted C.G.B.'s freedom, movement, and/or physical liberty, confining her to their home, without legal right, through the use of force, words,

or acts, which C.G.B. was afraid to ignore or to which she reasonably believed she must submit.

175.   C.G.B. was not free to leave defendants' control.

176.   Specifically, defendant Santa Lucia monitored and limited C.G.B.'s contact with the outside world and threatened C.G.B. that she would be arrested and deported if she left defendants' residence, while knowing that C.G.B. spoke limited English, had no access to public transportation, was unfamiliar with the area, and had very little money available to her.

177.   Thus, C.G.B. was unlawfully confined in defendants' Alpine, New Jersey residence.

178.   During this time, C.G.B. rarely left defendants' residence without being accompanied.

179.   Because of defendants' actions, C.G.B. was afraid to defy defendants and reasonably believed that she had to submit and remain in their home.

180.   Defendants committed these acts maliciously, with the wrongful intention of causing harm to C.G.B. and in conscious disregard for her rights.

181.   As a direct and proximate result of defendants' conduct, C.G.B. suffered damages, including emotional and psychological distress, pain and humiliation, economic injury from being deprived of the ability to go about her personal affairs, and other injuries.

182.   C.G.B. is entitled to recover damages in an amount to be determined at trial, including compensatory and punitive damages, attorneys' fees, and the costs of this action.

**COUNT VIII**
**(Punitive Damages/Special Damages)**
**(Against All Defendants)**

183.   C.G.B. re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

184.   Defendants' tortious conduct as alleged herein was undertaken deliberately and with actual malice, that is, with a sense of consciousness and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, and/or fraud.

185.   Defendants' conduct involved reckless or callous indifference to the federal and state protected rights of C.G.B. This conduct caused C.G.B. to suffer severe financial and emotional harm.

186.   C.G.B. is entitled to an award of punitive damages based upon defendants' malicious conduct in an amount to be determined at trial.

**PRAYER FOR RELIEF**

C.G.B. demands judgment against all defendants and respectfully requests that this Court grant the following relief, in amounts to be determined at trial, on each count detailed above:

a.   compensatory damages for each claim of relief;

b.   consequential damages;

c.   punitive damages (pecuniary and nonpecuniary);

d.   attorneys' fees and costs;

e.   injunctive relief and declaratory relief; and

f.   such other and further relief, both at law and in equity, as this Court may deem

just and proper.

## DEMAND FOR JURY TRIAL

C.G.B. demands a jury trial on all issues so triable.

## CERTIFICATION OF NO OTHER ACTIONS

The matter in controversy is not the subject of any other action pending in any

other court or of a pending arbitration proceeding, to the best of our knowledge and

belief. Also, to the best of our knowledge and belief, no other action or arbitration

proceeding is contemplated. Further, other than the parties set forth in this pleading as

John Does, we know of no other parties that should be joined in the above action. In

addition, we recognize the continuing obligation of each party to file and serve on all

parties and the court an amended certification if there is a change in the facts stated in

this original certification.

Respectfully submitted,
LAW OFFICE OF DONALD F. BURKE
Attorneys for Plaintiff
C.G.B.


 s/ Donald F. Burke
By: Donald F. Burke, Esq.

Dated: May 15, 2015

27